**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re Application of KOMET GROUP, S.A., | ) ) ) | |
| Applicant, | ) ) | |
| v. | ) ) | Case No. _____ |
| HUNT OIL COMPANY, HUNT OIL USA, INC., and AFREN USA, INC., | ) ) ) | |
| Respondents. | ) ) | |

**_EX PARTE_ APPLICATION FOR ORDER UNDER 28 U.S.C. § 1782 PERMITTING
KOMET GROUP, S.A. TO ISSUE A SUBPOENA FOR THE PRODUCTION OF
DOCUMENTS AND MEMORANDUM OF LAW IN SUPPORT**

1.      Pursuant to 28 U.S.C. § 1782, Komet Group, S.A. ("Komet") respectfully applies for an order granting it leave to serve subpoenas for the production of documents on Hunt Oil Company and Hunt Oil USA, Inc. (collectively, "Hunt") and Afren USA, Inc. ("Afren USA"). The proposed subpoenas are annexed as Exhibits A, B, and C to the declaration of Kevin D. Mohr, which is attached hereto as Exhibit 1.

2.      Komet seeks this limited but necessary discovery for use in an imminent proceeding before an international arbitration tribunal in London against the Kurdistan Regional Government of Iraq (the "KRG").  As explained below, and based on the affidavit of Artur Lungu that is attached as Exhibit 2, Komet meets all the statutory criteria for an order allowing the requested discovery, and the discretionary factors that this court can consider favor granting the application.

## JURISDICTION AND VENUE

1.      This Court may properly exercise subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1782.

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1782 because the Respondents reside in this district.

## PARTIES

3.      Applicant Komet is a company organized under the laws of the British Virgin Islands, and which has its principal place of business is Chisinau, Moldova.

4.      Respondent Hunt Oil Company is a Delaware corporation with its principal place of business in Dallas, Texas.

5.      Respondent Hunt Oil USA, Inc. is a Delaware corporation with its principal place of business in Dallas, Texas.

6.      Respondent Afren USA is a Delaware corporation with its principal place of business in The Woodlands, Texas.  Afren USA is a wholly-owned subsidiary of Afren plc ("Afren"), which is a publicly-traded independent oil and gas exploration and production company based in London

## *EX PARTE* APPLICATION

7.      Applications under Section 1782 for discovery are ordinarily addressed on an ex parte basis. *In re Ishihara Chem. Co., Ltd*., 121 F. Supp. 2d 209, 210 n.1 (E.D.N.Y. 2000) (discovery requests of the type authorized by § 1782 "are customarily received and appropriate action taken with respect thereto ex parte"), *quoting In re Letters Rogatory from Tokyo Dist., Tokyo, Japan*, 539 F.2d 1216, 1219 (9th Cir. 1976), *vacated on other grounds*, 251 F.3d 120 (2d Cir. 2001).

## FACTUAL BACKGROUND

**A.      Komet's Interests in the Maqlub Reservoir**

8.      Komet is an independent oil and gas exploration and production company that principally operates in the Kurdistan Region of Iraq.  *See* Affidavit of Artur Lungu, attached as Ex. 2, ¶ 3.

9.      On June 20, 2008, Komet entered into a Production Sharing Contract with the KRG which granted Komet certain rights to explore for and produce oil and gas in the Barda Rash Block in the Kurdistan Region of Iraq (the "Barda Rash PSC," attached as Exhibit 2-A). Ex. 2, ¶ 4.

10.      Pursuant to the Barda Rash PSC, Komet drilled and tested the 1 Barda Rash Well in 2009.  That exploration well discovered several previously unknown oil and gas reservoirs (the "Maqlub Reservoirs") that are located partially in the contract area covered by the Barda Rash PSC but partially outside that contract area in a region known as Maqlub (the "Maqlub Area").  Ex. 2, ¶ 5.  Komet subsequently conducted an appraisal project, including two additional appraisal wells, that generated substantial and valuable data about the size, location, potential value, and other attributes of the Maqlub Reservoirs, and which confirmed that the Maqlub Reservoirs are continuous from the Barda Rash contract area into Maqlub Area.  *Id.*

11.      To Komet's knowledge, at the time of its discovery, the Maqlub Area was not subject to any other contract granting exploration and development rights to another operator. Ex. 2, ¶ 6.  The KRG's Ministry of Natural Resources publishes its oil and gas contracts on its website, and there are no agreements covering the Maqlub Area (prior to the July 2011 agreement with Hunt that is discussed below).  *Id.*

12.     Under the terms of the Barda Rash PSC, Komet was entitled to have the contract area of the Barda Rash PSC extended to cover the Maqlub Reservoir.  Article 34.2 of the Barda Rash PSC provides:

> For clarification and the avoidance of doubt and notwithstanding Article 47 of the Kurdistan Region Oil and Gas Law, in the event that a Reservoir extends beyond the boundaries of the Contract Area into an adjacent area which is not the subject of another Petroleum Contract (as defined by the Kurdistan Region Oil and Gas Law), the GOVERNMENT shall, upon the CONTRACTOR's request, take the necessary steps to extend the boundaries of Contract Area so as to include the entire Reservoir within the Contract Area, provided that the CONTRACTOR can offer the GOVERNMENT a competitive minimum work program for such adjacent area.

*See* Barda Rash PSC, Ex. 2-A, Art. 34.2.

13.     Alternatively, even if the Maqlub Reservoirs were subject to another contract at the time of Komet's discovery, Komet was entitled to have the reservoirs unitized between itself and the other contractor.  Article 34.1 of the Barda Rash PSC provides:

> In the event a Reservoir extends beyond the Contract Area into an adjacent area which is the subject of another Petroleum Contract (as defined by the Kurdistan Region Oil and Gas Law) (an "Adjacent Contract Area"), … the GOVERNMENT shall require the CONTRACTOR and the contractor of the Adjacent Contract Area to agree upon a schedule for reaching agreement of the terms of the unitisation of the Reservoir….

Ex. 2-A, Art. 34.1.

14.     Similarly, Article 47, Second of the Oil & Gas Law of the Kurdistan Region of Iraq (the "KRG Oil & Gas Law") provides that a "Reservoir that lies partly within a Contract Area, and partly in another Contract Area, shall be unitised…."  *See* KRG Oil & Gas Law (2007), attached as Ex. 1-D, Art. 47, Second.

15.     On February 24, 2010, Komet wrote the KRG pursuant to both Article 34 of the Barda Rash PSC and Article 47 of the KRG Oil & Gas Law requesting that the KRG extend the contract area of the Barda Rash PSC to include the Maqlub Area (the "Unitization Request,"

attached as Ex. 2-B).  Ex. 2, ¶ 10.  In making the Unitization Request, Komet provided the KRG

not only with the coordinates of the proposed extension area, but also substantial geological and

geophysical data regarding the Maqlub Reservoirs supporting its request (the "Confidential

Information").  *Id*.

      16.    To date, despite Komet's numerous follow-up requests, the KRG has not granted

the Unitization Request, in breach of its obligations under the Barda Rash PSC and the Oil &

Gas Law.  Ex. 2, ¶ 11.

**B.    The KRG's Assignment of the Maqlub Reservoir to Hunt**

      17.    To the contrary, the KRG granted exploration and development rights in the

Maqlub Area to Hunt on July 26, 2011.  Ex. 2, ¶ 12.  Hunt already had a Production Sharing

Contract for a neighboring block known as Ain Sifni (the "Ain Sifni PSC"), which it entered into

with the KRG on September 8, 2007.  *Id*.  The Maqlub Reservoirs did not extend within the

original contract area of the Ain Sifni PSC.  *Id*.  Yet, on July 26, 2011, the KRG entered into a

Novation and First Amendment Agreement with Hunt that extended the contract area of the Ain

Sifni PSC to include the Maqlub Area.  *Id*.; *see also* Novation and First Amendment Agreement,

attached as Exhibit 2-C.  The new contract area added to the Ain Sifni PSC under that

amendment appears to be identical to the area that Komet requested be added to the Barda Rash

PSC in its Unitization Request nearly a year and a half earlier.  Ex. 2, ¶ 12.

      18.    Despite numerous requests, the KRG has provided no explanation or legal basis

for its decision to extend Hunt's Ain Sifni PSC to cover the Maqlub Area rather than Komet's

Barda Rash PSC. Ex. 2, ¶ 13.

### C.     The Afren Transactions

19.     Around the same time as it granted the Maqlub Area to Hunt, the KRG entered into two other transactions by which it profited substantially from its inclusion of the Maqlub Area in the Ain Sifni PSC rather than the Barda Rash PSC.  The KRG obtained a 20% working interest in the Ain Sifni PSC from a third party, increasing its total working interest to 40% (with Hunt holding the other 60%).  *See* Ex. 2-C.  It then sold a 20% interest to an Afren affiliate (Beta Energy Limited) for approximately $170 million (the "Ain Sifni Participation Interest").  *See* Afren Press Release, Ex. 2-D.

20.     Moreover, Komet also was in negotiations with Afren regarding the sale of an interest in the Barda Rash PSC at the very same time.  Ex. 2, ¶ 15.  On July 27, 2011, Komet and Afren entered  into a Farm-In Agreement that granted Beta a 60% operating working interest in the Barda Rash PSC (the "Barda Rash Farm-In Agreement"). *Id.*  Employees of Afren USA were actively involved in the negotiations between Komet and Afren. *Id.*  Specifically, Mr. Shahid Ullah (the Chief Operations Officer of Afren plc who is based in Afren USA's office in the United States) personally participated in those negotiations and executed the term sheet for the Barda Rash Farm-In Agreement, and other U.S.-based Afren personnel traveled to Iraq for meetings with Komet regarding this transaction.  *Id.*; *see also* emails attached as Exhibits 2-E and 2-F.

21.     Since Komet did not know that the KRG already had granted the Maqlub Area to Hunt, the Barda Rash Farm-In Agreement contained provisions addressing Komet's obligations to continue pursuing the Unitization Request and the respective rights of Komet and Afren if and when that request were granted.  Ex. 2, ¶ 16.

22.     Shortly after executing the Barda Rash Farm-In Agreement, Komet learned for the first time that the KRG had granted the Maqlub Area to Hunt, and then sold the Ain Sifni Participation Interest (including the Maqlub Area) to Afren, when it saw Afren's July 27, 2011 press release announcing both the Barda Rash Farm-In Agreement the Ain Sifni Participation Interest.  Ex. 2, ¶ 17.

23.     On the same day that Afren made its press release announcing the acquisitions, it also published investor presentation materials that not only showed the Maqlub Reservoirs to exist, in part, within the Barda Rash PSC contract area, but also described the "Maqlub structure" as "interpreted to be an extension of proven Barda Rash structure."  See Ex. 2, ¶ 18; Ex. 2-H, pp. 8 and 25.

24.     A few days later, Afren stated publically in a conference call with investors and analysts that the Maqlub Reservoirs comprised a substantial portion of its valuation of the Ain Sifni Participation Interest. Specifically, in response to a question about why it paid more for the Ain Sifni interest than the Barda Rash interest (on a dollar-per-proven-barrel basis), Afren stated:

> In terms of the acquisition, the consideration, you're correct on $1 per barrel basis, Ain Sifni is more expensive; if you will, we're still talking sub $2 a barrel. But, I think, what may not fully come out is that the upside that we see in Ain Sifni is absolutely enormous. Just on the Maqlub structure, we believe that obviously we need to do more work, but we believe that Maqlub structure alone could be double the size of Barda Rash.

See Transcript of Afren Conference Call, attached as Ex. 2-G

## D.     Komet's Attempts to Obtain Information From the KRG, Hunt, and Afren

25.     Based on these facts, Komet reasonably suspected that the KRG had violated its rights in at least two respects.  First, Komet believes that the KRG breached Article 34.2 of the Barda Rash PSC by failing to grant its Unitization Request to extend the contract area of that PSC to include the Maqlub Area.  Second, in light of the close timing of these transactions and

the fact that Hunt and Afren had no prior drilling activity in the Maqlub Area, it seems likely that the KRG shared Komet's confidential information about the Maqlub Reservoirs with Hunt and Afren in violation of the confidentiality obligations in Article 36 of the Barda Rash PSC.  Ex. 2, ¶ 20.

26.     Before initiating any legal action based on these suspicions, however, Komet afforded the KRG, Hunt, and Afren several opportunities to provide information showing that these transactions did not violate Komet's rights.  Ex. 2, ¶ 21.

27.     First, on December 13, 2011, Komet sent a request to the KRG for information related to Hunt's acquisition of exploration rights for the Maqlub Area, including any relevant contracts, applications, correspondence, and technical data.  *See* Dec. 13, 2011 Letter to Minister Hawrami, Ex. 1-E.  The KRG has never provided these documents.  Ex. 1, ¶ 5.

28.     On the same day, Komet also sent a letter to Hunt explaining its concerns, and requesting that Hunt provide information about whether it ever was aware of Komet's Unitization Request, whether Hunt ever received any of Komet's Confidential Information regarding the Maqlub Reservoirs, and how Hunt came to acquire rights regarding the Maqlub Area.  *See* Dec. 13, 2011 Letter to Mark Gunnin, Ex. 1-F.  Hunt did not respond to that letter.  Ex. 1, ¶ 6.

29.     Shortly after sending those two letters, Komet had several discussions with the KRG's Minister of Natural Resources about these issues. Ex. 2, ¶ 22.  At the Minister's request, in order to facilitate those discussions, Komet sent a letter to Hunt on January 3, 2012, informing Hunt that it would not expect a response to its information request until January 20, 2012.  *See* Jan. 3, 2012 Letter to Mark Gunnin, Ex. 1-G.  January 20 came and went with no response from Hunt.  Ex. 1, ¶ 7.

30.     Unfortunately, Komet's discussions with the Minister of Natural Resources proved to be fruitless.  Ex. 2, ¶ 23.  The KRG offered only vague assertions that its actions were proper, and did not provide any details or documents to support those claims.  It certainly did not offer to make Komet whole.  *Id.*

31.     Accordingly, after exhausting discussions with the KRG, Komet sent another letter to Hunt on March 14, 2012, reiterating its request for information.  *See* Mar. 14, 2012 Letter to Mark Gunnin, Ex. 1-H.  Hunt finally responded to that letter, but it also provided no meaningful information.  In a letter dated March 29, 2012, Hunt's counsel asserted that Hunt "held various rights and interests in the Maqlub area since 2007 and commenced a seismic program in the Maqlub area in 2007.  As such, HOME's rights and activities in the Maqlub area predate your client's PSC covering the Barda Rash Block and its discovery well on that block." *See* March 29, 2012 Letter from Sean Korney, Ex. 1-I.  Citing confidentiality concerns, however, Hunt refused to provide any details or documents to substantiate these assertions.  Hunt's response thus left many important questions unanswered, such as:

(1)     What is Hunt referring to as the "Maqlub area," and is that actually the area where the Maqlub Reservoirs are located;

(2)     What contractual rights did Hunt acquire in the Maqlub Area, and when;

(3)     What seismic program did Hunt commence in the "Maqlub area" in 2007, and did that program actually discover the Maqlub Reservoirs; and

(4)     Did Hunt ever acquire any of Komet's Confidential Information regarding the Maqlub Reservoirs?

32.     On March 15, 2012, Komet also sent a letter to Afren explaining its concerns, and requesting that Afren provide information about whether it ever was aware of Komet's Unitization Request, whether Afren ever received any of Komet's Confidential Information regarding the Maqlub Reservoirs, and what Afren knew about the dealings between the KRG and

Hunt at the time it was simultaneously negotiating the Farm-In Agreement with Komet and the acquisition of a participation interest in Hunt's Ain Sifni PSC.  *See* March 15, 2012 Letter to Afren, Ex. 1-J.  Afren responded in a letter from its counsel on March 26, 2012, the essence of which was: "we do not think it would be productive to respond in detail to the various matters set out in your letter, much of which would appear to be better directed to the Kurdistan Regional Government."  *See* Letter from White & Case dated March 26, 2012, Ex. 1-K.[1]  Afren provided no documents or other information responsive to Komet's requests.

33.     In light of the confidentiality concerns raised by Hunt, as well as Afren's position that all of these questions should be directed to the KRG (which has been totally unresponsive), Komet made one last attempt to obtain answers by addressing all three parties jointly.  In a letter dated April 3, 2012 to the KRG and counsel for Hunt and Afren, Komet reiterated the basis for its concerns, and invited the three parties jointly to present any facts showing that Komet's concerns are invalid.  *See* Letter to Minister Hawrami, Sean Kormey, and Jason Yardley dated April 3, 2012, Ex. 1-L.  Specifically, Komet wrote:

> While Komet understands the importance of honoring confidentiality obligations, those can be waived by agreement. Accordingly, we now approach the KRG, Hunt, and Afren jointly to request that they all agree to waive their confidentiality objections in order to provide Komet a full explanation and any documents supporting their contentions that their dealings regarding the Maqlub Block did not violate Komet's rights. Specifically, if the KRG, Hunt, and Afren contend that Hunt had pre-existing rights to the Maqlub Block that were superior to Komet's,

---

[1]     Afren also asserted that it has no liability to Komet because of a September 7, 2011, amendment to the Farm-In Agreement addressing the parties' contractual rights and duties related to the Maqlub Block (in light of the fact that it already had been assigned to Hunt, which Komet only discovered after the Farm-In Agreement was executed).  That argument is irrelevant to this proceeding, which seeks information to assist Komet in pursuing its claims against the KRG and does not assert any claims against Afren.  That argument is also wrong.  Komet sought that September 7 amendment in order to make clear that it had no ongoing contractual obligations to pursue the Maqlub Block, which was no longer available.  That amendment has no effect on Afren's potential liability for misrepresentation, misuse of confidential information, civil conspiracy, or any other wrongdoing that may have occurred in these events.

they should provide the contracts on which they rely. Likewise, if the three parties contend that they did not use any of Komet's confidential information regarding the Maqlub Block in evaluating these transactions, they should explain what information they did use and how it was obtained.

If the KRG, Hunt, and Afren decline to provide this information voluntarily, Komet can only conclude that it does not exist. In that case, Kamet will pursue its remedies in court and arbitration. Obviously, such proceedings will entail substantial costs for all parties. If indeed Komet's contentions are mistaken, as the KRG, Hunt, and Afren apparently contend, those costs can be avoided simply by providing the material information supporting that position.

*Id.*

34.     Komet requested a response by April 16, 2012. *Id.* The KRG did not respond at all. Ex. 1, ¶ 12. Afren responded with a curt statement that its position is not based on confidentiality concerns, but rather, the fact that Komet had not responded to Afren's assertion in its March 26 letter that it has no liability to Komet. *See* Letter from White & Case dated April 16, 2012, Ex. 1-M. Afren simply ignored the obvious fact that Komet is also attempting to obtain information regarding its claims *against the KRG*. Hunt ultimately responded in an April 24, 2012 letter, claiming again without any supporting documentation or details of any kind that Hunt has "rights and interests in the Maqlub area that predate Komet's entry into the Barda Rash PSC." *See* Letter from Baker Botts dated April 24, 2012, Ex. 1-U.

## E.     Komet's Arbitration Against the KRG

35.     Having received no substantive answers from the KRG, Hunt, or Afren, or any supporting documentation -- despite multiple good-faith attempts -- Komet was left with no choice but to assert its claims against the KRG. Under Article 42 of the Barda Rash PSC, disputes are to be resolved in arbitration under the rules of the London Court of International Arbitration. *See* Ex. 2-A, Art. 42.1(c). The first step in initiating an arbitration is to submit a formal Notice of Dispute to the other party. *Id.*, Art. 42.1. The PSC requires that the Dispute first be discussed in a meeting of senior representatives and then in a mediation. *Id.*, Art.

42.1(a)-(b).  If those nonbinding discussions are unsuccessful, the Dispute can then be referred to arbitration for a binding determination.  *Id.*, Art. 42.1(c).

36.     On April 3, 2012, Komet submitted its formal Notice of Dispute to the KRG asserting claims for breach of the unitization and confidentiality provisions of the Barda Rash PSC, and similar provisions of the Oil & Gas Law.  *See* Notice of Dispute, dated April 3, 2012, Ex. 1-N.  In light of the KRG's totally unresponsive posture to date, the meeting of senior representatives and mediation that must be completed before a Dispute can be referred to arbitration appear to be mere formalities.  Thus, Komet expects that it will initiate an arbitration against the KRG imminently, *e.g.*, within around 120 days of its Notice of Dispute, the earliest permitted by the Barda Rash PSC (the "KRG Arbitration").  *See* Ex. 2-A. Art. 42.1(c); Ex. 2, ¶ 24.

37.     Pursuant to 28 U.S.C. § 1782, Komet seeks documents from Hunt and Afren, both of whom can be found in this district, for use in the KRG Arbitration.  As shown below, Komet meets all the statutory criteria, and the discretionary factors weigh in favor of granting this relief.

### ARGUMENT AND AUTHORITIES

**A.     Komet Meets the Statutory Criteria for Granting the Application**

38.     Section 1782(a) of Chapter 28 of the U.S. Code provides:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.  By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement.  The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document

or other thing.  To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

39.     Accordingly, the statute imposes three minimal criteria for obtaining discovery: (1) that the respondents reside in or may be found in the district; (2) that the discovery be for use in a "proceeding in a foreign or international tribunal"; and (3) that the applicant be an "interested person" entitled to invoke the statute.  Each of these criteria is met here.

*1.     Respondents Can Be Found In This District*

40.     First, all three Respondents can be found in this district because they are Delaware corporations.  *See* Hunt Oil Company's Certificate of Incorporation, Ex. 1-O; Hunt Oil USA's Certificate of Incorporation, Ex. 1-P; Afren Certificate of Incorporation, Ex. 1-Q.

41.     While the two Hunt entities that are named as respondents here are not direct signatories to the Ain Sifni Novation and First Amendment Agreement, they nonetheless are proper respondents to this Section 1782 application because they are likely to have possession, custody, or control of the requested documents. First, Hunt Oil Company gave a guarantee in respect of Hunt Oil Middle East Limited's obligations under the Ain Sifni Novation and First Amendment Agreement. *See* Ex. 1-V.  Moreover, the Ain Sifni Novation and First Amendment Agreement states that Hunt Oil Middle East Limited has its registered office at 1900 North Akard Street in Dallas, Texas. *See* Ex. 2-C, p. 3.  Hunt Oil Company and Hunt Oil USA, Inc. also have their offices at that address. *See* Ex. 1-W.  Additionally, the Ain Sifni Novation and First Amendment Agreement was executed by Ken Topilinski, who is identified on Hunt's website as a senior vice president of Hunt Oil Company.  *See* Ex. 1-S. Moreover, a Dunn & Bradstreet report on Hunt Oil Middle East Limited identifies it as a d/b/a (*i.e.*, trade name) of

Hunt Oil USA, Inc.  *See* Ex. 1-T.  Thus, Hunt Oil Company and/or Hunt Oil USA appear to be directly involved in Hunt Oil Middle East Limited's dealings in Iraq, using the same offices and personnel, and thus will have possession, custody, or control of the documents that Komet seeks. A parent company is a proper respondent to a Section 1782 application when the parent company or its officers have possession, custody, or control of the documents requested.  *See In re Hallmark Capital Corp.*, 534 F. Supp. 2d 981 (D. Minn. 2008).

42.     The same is true of Afren USA, Inc.  Although the party to these transactions is another subsidiary of Afren (Beta Energy Limited), employees of Afren USA participated directly in the transaction with Komet as described above. *See* Par. 20, *supra*; Ex. 2, ¶ 15; Exs. 2-E and 2-F.  Komet is seeking discovery of the documents in the possession, custody, or control of Afren USA, Inc.

    2.     *The Discovery Is Sought for Use in a Proceeding in a Foreign Tribunal*

43.     Second, the discovery is sought for use in a "proceeding in a foreign or international tribunal," namely the KRG Arbitration in the London Court of International Arbitration.  *See In re Chevron Corp.*, 633 F.3d 153, 161 (3d Cir. 2011) (holding that discovery sought for use in an arbitration against Ecuador "unquestionably would be 'for a use in a proceeding in a foreign or international tribunal'"); *Comision Ejecutiva Hidroelectrica del Rio Lempa v. Nejapa Power Co., LLC*, C.A. No. 08-135-GMS, 2008 WL 4809035, at *1 (D. Del. Oct. 14, 2008) (holding that "Section 1782 does indeed apply to private foreign arbitrations"), *appeal dismissed as moot*, 341 Fed. App'x 821 (3d Cir. 2009).

44.     There is no requirement that the proceeding be pending or imminent; Section 1782 requires only that the proceeding be "within reasonable contemplation."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004).  In this case, the KRG Arbitration

easily meets this requirement.  Komet has sent the Notice of Claim necessary to initiate the Dispute, and absent a radical change of position by the KRG, the arbitration is inevitable.

### 3.    Komet is an "Interested Party"

45.    Third, Komet is an "interested party," within the meaning of Section 1782, because it is the Claimant in the KRG Arbitration.  *Id*. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person [s]' who may invoke § 1782.").

## B.    This Court Should Exercise Its Discretion to Grant the Application

46.    When the statutory criteria are satisfied, the "'the issuance of an appropriate order' is left to the discretion of the district court."  *In re Bayer AG*, 146 F.3d 188, 192 (3d Cir. 1998).  In *Bayer*, the Third Circuit went on to emphasize that relevant evidence is presumptively discoverable under Section 1782:

> The reference in § 1782 to the Federal Rules [of Civil Procedure] suggests that under ordinary circumstances the standards for discovery under those rules should also apply when discovery is sought under the statute. Consistent with the statute's modest prima facie elements and Congress's goal of providing equitable and efficacious discovery procedures, district courts should treat relevant discovery materials sought pursuant to § 1782 as discoverable unless the party opposing the application can demonstrate facts sufficient to justify the denial of the application.

*Id*. at 195.

47.    Additionally, in *Intel*, the Supreme Court identified four factors that district courts should consider when exercising their discretion under Section 1782: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the "nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) whether the application "conceals an attempt to circumvent foreign proof-gathering restrictions

or other policies of a foreign country or the United States"; and (4) whether the information requested is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 264-65.

48.     This Court should grant Komet's application because the information sought is highly relevant, and the four *Intel* criteria weigh heavily in favor of allowing the discovery.

> *1.     Komet Seeks Highly Relevant Discovery That Is Not Unduly Intrusive or Burdensome.*

49.     As emphasized by the Third Circuit in *Bayer*, relevance of the information requested is a central issue in evaluating an application under Section 1782.  Discovery under Section 1782 "may be as broad and as liberal as the Federal Rules allow."  *Fleischmann v. McDonald's Corp.*, 466 F. Supp. 2d 1020, 1029 (N.D. Ill. 2006) (citing *Bayer*, 146 F.3d at 195; *In re Application Pursuant to 28 U.S.C. § 1782*, 249 F.R.D. 96, 106 (S.D.N.Y. 2008) ("The proper scope of the discovery sought under section 1782, like all federal discovery, is governed by Federal Rule 26(b).").  Here, the information requested is highly relevant under the standards in Rule 26, and the requests are not unduly intrusive or burdensome.

50.     Komet seeks the following documents from Hunt, all of which are directly relevant to Komet's claims against the KRG for the reasons explained below:

1.     Any agreements between Hunt, the KRG, and/or Afren concerning the Maqlub Area or Reservoirs;

2.     Any communications between Hunt, the KRG, and/or Afren regarding the Maqlub Area or Reservoirs, including, but not limited to Hunt's request for unitization of the Maqlub Area with Hunt's Ain Sifni PSC or Hunt's request to the KRG to grant it exploration and development rights with respect to the Maqlub Area;

3.     Hunt's internal communications and memoranda regarding the Maqlub Area or Reservoirs, including, but not limited to Hunt's request for unitization of the Maqlub Area with Hunt's Ain Sifni PSC or Hunt's request to the KRG to grant it exploration and development rights with respect to the Maqlub Area;

4.      Hunt's internal communications and memoranda, if any, and communications between Hunt, the KRG, and/or Afren regarding or referencing Komet that are related to the Maqlub Area or Reservoirs, including but not limited to Komet's Unitization Request or Komet's claim of a right to acquire additional interests in the Maqlub Area;

5.      The documents, technical data, and other information on which Hunt based its decision to seek an interest in and to enter into a contract with the KRG to explore and develop the Maqlub Area;

6.      All documents related to Hunt's negotiations for and acquisition of its interest in the Maqlub Area, including, but not limited to Hunt's requests to the KRG to unitize the Maqlub Area with Hunt's Ain Sifni Production Sharing Contract and any documents submitted in support of the request and the KRG's responses thereto;

7.      Any documents containing information regarding the Maqlub Area or Reservoirs that Hunt received from Komet, the KRG, or Afren, and any communications between Hunt, the KRG, and/or Afren regarding or transmitting such documents;

8.      Documents showing Hunt's exploration and development activity in the Maqlub Area before Komet's Unitization Request of February 24, 2010; and

9.      All documents, if any, which refute or are inconsistent with Komet's claim that the KRG was obligated to grant its Unitization Request for the Maqlub Area.

These documents are all highly relevant to at least three central issues at the heart of Komet's claims against the KRG.  *First*, did Hunt have contract rights in the Maqlub Area at the time of Komet's discovery and Unitization Request sufficient to preclude Komet's right to have the contract area of the Barda Rash PSC extended to cover that area, under Article 34.2 of that PSC? *Second*, did the KRG provide any of Komet's Confidential Information to Hunt for Hunt's use in evaluating the Maqlub Reservoirs and the Participation Agreement with Afren?  *Third*, what are Komet's damages?

51.      Komet seeks the following documents from Afren, which are directly relevant to Komet's claims against the KRG for the reasons explained below:

1.      Any agreements between Hunt, the KRG, and/or Afren concerning the Maqlub Area or Reservoirs;

2.      Afren's internal communications and memoranda (including minutes of any board meetings), and any communications between Afren, the KRG, and/or Hunt regarding the Maqlub Area or Reservoirs, including, but not limited to: (1) Komet's Unitization Request, (2) Komet's claim of a right to acquire additional interests in Maqlub Area, (3) Hunt's request for unitization of the Maqlub Area with Hunt's Ain Sifni PSC and the extension of the Hunt's Ain Sifni PSC to cover the Maqlub Area, and (4) Afren's purchase of an interest in the Ain Sifni PSC;

3.      The documents, technical data, and other information on which Afren based its decision to purchase an interest in the Ain Sifni PSC;

4.      All documents related to Afren's negotiations for and acquisition of its interest in the Ain Sifni PSC;

5.      Any documents containing information regarding the Maqlub Area or Reservoirs that Afren received from Komet, the KRG, or Hunt, and any communications between Hunt, the KRG, and/or Afren regarding or transmitting such documents;

6.      Any internal communications of Afren and communications between Afren and Komet regarding Afren's transactions with Komet pertaining to the Barda Rash PSC and Komet's Unitization Request; and

7.      All documents, if any, which refute or are inconsistent with Komet's claim that the KRG was obligated to grant its Unitization Request for the Maqlub Area.

These documents also are all highly relevant to whether the KRG provided any of Komet's Confidential Information to Afren and to the amount of Komet's damages. These documents also are likely to shed light on the state of Hunt's rights to the Maqlub Area, and the impact of any such rights on Komet's claims against the KRG.

52.     Additionally, requiring Hunt and Afren to produce this information is neither unduly intrusive nor burdensome. These requests are narrowly tailored to discrete categories of information that are directly relevant to Komet's claims. Moreover, while Hunt and Afren are not parties to the KRG Arbitration (which weighs in favor of granting the Application, as

explained in the next section), they are not strangers to the transactions giving rise to Komet's claims against the KRG.   Rather, they were active and voluntary participants in those transactions, which are worth hundreds of millions of dollars.  The cost of complying with these narrowly-tailored discovery requests is not unreasonable in light of the value of these transactions to Hunt and Afren, and the value of Komet's claims.[2]

53.     Finally, to the extent that Hunt or Afren have confidentiality objections to producing any of the requested information, those concerns can be addressed through a reasonable protective order.   *See Bayer*, 146 F.3d at 196 (remanding to district court for consideration of "appropriate measures, if needed, to protect the confidentiality of materials").

*2.     Hunt and Afren Are Not Participants In the KRG Arbitration.*

54.     In *Intel*, the Supreme Court explained that:

> when the person from whom discovery is sought is a participant in the foreign proceeding (as Intel is here), the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad. A foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence.

*Intel*, 542 U.S. at 264.  Hunt and Afren are not participants in the KRG Arbitration.  Thus, this factor weighs plainly in favor of granting Komet's application.

*3.     The LCIA Is Receptive to Assistance Under Section 1782.*

55.     LCIA arbitrations are generally confidential, so there is no record of opinions in which LCIA tribunals have expressed their views on litigants obtaining discovery through

---

[2]     Komet has not completed an evaluation of its potential damages in its claims against the KRG.  But based on its prior analysis of the Maqlub Reservoir and Afren's public statements about what it paid for the Ain Sifni Participation Interest, Komet's potential damages are certainly in the hundreds of millions of dollars.

Section 1782 applications.[3]  Like most arbitral tribunals, however, LCIA tribunals do not have the subpoena and contempt powers of courts to enforce their awards and ensure compliance with their discovery orders and other instructions to participants, or to order non participants to appear and provide information.  Thus, an LCIA tribunal "must rely on the aid of courts beyond its jurisdiction - such as United States District Courts acting pursuant to § 1782(a) - to enforce its demands and to aid its inquiries."  *In re Roz Trading*, 469 F. Supp. 2d 1221, 1229 (N.D. Ga. 2006) (finding that Vienna International Arbitration Centre's dependence on courts weighed in favor of granting Section 1782 application).

56.     Additionally, nothing in the LCIA's arbitration rules suggests any hostility to discovery assistance from U.S. courts through Section 1782.  In fact, the LCIA rules expressly recognize that parties may seek the assistance of courts or other judicial authorities, particularly before the arbitration has begun.  Rule 25.3 of the LCIA Rules states, "[t]he power of the Arbitral Tribunal under Article 25.1 [to award interim measures] shall not prejudice howsoever any party's right to apply to any state court or other judicial authority for interim or conservatory measures before the formation of the Arbitral Tribunal and, in exceptional cases, thereafter."  *See* LCIA Rules, Ex. 1-R, R. 25.3.  While this rule does not expressly concern discovery measures, it recognizes the important role of courts in assisting an LCIA tribunal in carrying out its functions.

57.     Moreover, the LCIA rules expressly provide that the primary duties of an LCIA tribunal are:

> (i) to act fairly and impartially as between all parties, giving each a reasonable opportunity of putting its case and dealing with that of its opponent; and

---

[3]     *See* LCIA's website at http://www.lcia.org/Frequently_Asked_Questions.aspx#Publish (stating that the LCIA does not publish awards or provide information about pending or completed arbitrations to nonparties).

> (ii) to adopt procedures suitable to the circumstances of the arbitration, avoiding unnecessary delay or expense, so as to provide a fair and efficient means for the final resolution of the parties' dispute.

*Id.*, R. 14.1.   Allowing a party to use judicial processes like Section 1782 to obtain discovery from nonparties is entirely consistent with these twin goals.   It enables a party's reasonable opportunity to put on its case and deal with that of its opponent, in order to obtain a fair resolution of the dispute, without causing any unnecessary delay or expense to the parties.

> 4.    *Komet Is Not Seeking to Circumvent Foreign Proof-Gathering Restrictions.*

58.    No discovery proceedings have yet commenced in the KRG Arbitration, which, as noted above, is still in the mandatory negotiation phase that must be completed before the commencement of the arbitration *per se* under the terms of the PSC.   Accordingly, there are no restrictions on proof gathering in the KRG Arbitration.   Nor is there any reason to believe there will be.   Rule 22.1(e) of the LCIA Rules expressly authorizes the tribunal "to order any party to produce to the Arbitral Tribunal, and to the other parties for inspection, and to supply copies of, any documents or classes of documents in their possession, custody or power which the Arbitral Tribunal determines to be relevant."   *Id.*, R. 22.1(e).   Thus, there is no reason to believe that the tribunal in the KRG Arbitration will restrict Komet from discovering the kinds of documents at issue here, which are directly relevant to Komet's claims.

59.    Moreover, Section 1782 does not require that the information sought be discoverable under the procedures of the foreign tribunal.   *See Intel*, 542 U.S. at 261 ("[T]here is no reason to assume that because a country has not adopted a particular discovery procedure, it would take offense at its use.") (citing *Bayer*, 146 F.3d at 194).   The primary question in determining whether a Section 1782 application seeks to circumvent foreign proof-gathering restrictions is whether the discovery is being sought in bad faith, *i.e.*, for reasons other than "a

good faith belief that § 1782 discovery would be helpful to the foreign tribunals and itself." *See Minatec Fin. S.A.R.L. v. SI Grp. Inc.*, C.A. No. 1:08-CV-269-LEK/RFT, 2008 WL 3884374, at *8 (N.D.N.Y. Aug. 18, 2008) ("The primary issue for us is whether Minatec is pursuing this discovery in bad faith.").  In light of the central relevance of the information sought, Komet very clearly is pursuing the Section 1782 application because it believes the information will be helpful in the KRG Arbitration, and not for some improper purpose.

## C.    Procedure

60.     Section 1782 provides that the Court's order granting the application "may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the [international tribunal].  To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure."  The LCIA Rules provide no clear rules of practice and procedure for obtaining discovery, and instead vest broad discretion in the tribunal to make such procedural orders.  *See* Ex. 1-R, R. 22.1.  Accordingly, Komet requests that the Federal Rules of Civil Procedure apply, and that the Court grant it leave to serve the subpoenas attached as Exhibits 1-A, 1-B, and 1-C pursuant to Federal Rule of Civil Procedure 45.

## CONCLUSION AND PRAYER

WHEREFORE, Applicant Komet Group, S.A. respectfully requests that the Court grant it leave to serve the subpoenas attached as Exhibits 1-A, 1-B, and 1-C pursuant to 28 U.S.C. § 1782 and Federal Rule of Civil Procedure 45, and grant such other relief as it deems just and proper.

Respectfully submitted,

_/s/ John M. Seaman_____

Of Counsel:

John M. Seaman (#3868)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware 19807
(302) 778-1000
seaman@abramsbayliss.com

Reginald R. Smith
Kevin D. Mohr
KING & SPALDING LLP
1100 Louisiana Street, Suite 4000
Houston, TX 77002
(713) 751-3200
kmohr@kslaw.com

*Attorneys for Applicant Komet Group, S.A.*

Dated: May 2, 2012